### UNITED STATES v. CHARLES G. DUNN CO., Limited.

(Circuit Court, E. D. Pennsylvania. August 8, 1903.)

#### No. 47.

1. NAVIGABLE WATERS—PIERS—INJURIES—NEGLIGENCE—EVIDENCE.

In an action against the owners of a vessel to recover damages for injuries to plaintiff's pier in a river, caused by a collision in the nighttime, evidence reviewed, and *held* insufficient to establish negligence on the part of the branch pilot navigating the vessel in failing to discover the pier, which was unlighted, in time to avoid it.

J. Whitaker Thompson and James B. Holland, for plaintiff.

Horace L. Cheyney and John F. Lewis, for defendant.

J. B. McPHERSON, District Judge. This action at law, which was tried without a jury, involves the liability of the defendant for injury done to a pier belonging to the government. From the evidence produced, much of which was heard in open court, I find the following facts:

(1) On September 21, 1900, the United States was the owner of a disinfecting pier, built on piles in the channel of the Delaware river, about 1,200 feet eastward of the Reedy Island quarantine station. It was erected by the government several years before the collision, to provide a place and facilities for disinfecting vessels on their way up the river. The pier, which was nearly covered by low buildings, was about 50 feet wide by 250 feet long, and was protected at each end by an ice-break about 75 feet long. The water immediately about the pier was from 24 to 26 feet deep.

(2) The defendant is the owner of the British steamship Falloden Hall, of 3,389 gross and 2,206 net registered tonnage. She is 335 feet long, 43.7 feet wide, and 18.6 feet deep in the hold. On the foregoing date she was bound from Java to Philadelphia with a heavy cargo of sugar—about 4,400 tons—and was drawing from 23 to 24 feet of water. She was in charge of a licensed branch pilot, who was taken on board at the Delaware Breakwater by the master of the vessel, in compliance with the pilotage laws of the state of Pennsylvania. As the ship approached the pier, the pilot, the master, and the first officer were on the bridge, a quartermaster was at the wheel, and an able seaman was on lookout upon the forecastle head.

(3) About 8 o'clock in the evening of September 21st the steamship collided with the pier, wrecking the southern ice-break, and

injuring the buildings and machinery. The collision occurred under the following circumstances:

The night was dark and clear, and the tide was three-quarters flood. An ordinary anchor light was hung upon a bracket projecting from the eastern side of the pier, and could have been seen from the channel ranges, but it was not visible from the course taken by the steamship. No other light had been displayed on the pier before the date of the collision, but since that time its position in the channel has been marked by a red light at each end. The channel, or Finn's Point, ranges are about a quarter of a mile eastward of the pier, running N. by E. ⅛ E., and the long axis of the pier is about parallel with the ranges. Owing to a deposit at the lower end of the range, which was then being dredged out, deep draught vessels, such as the Falloden Hall, kept to the western side of the channel, where the water was deeper, and passed about 300 feet to the eastward of the pier. On the night in question, the Newcastle, a vessel which was then in quarantine, was anchored about 1,200 feet below, and on a line with, the pier. She had been ordered to this berth by the physician in charge of the station. At the time of the collision at least two, and probably three, dredges were at anchor in the channel nearly on the line of the Finn's Point ranges, one of them lying nearly abreast of the Newcastle to the eastward. After the Falloden Hall had made the turn from the Reedy Island ranges, which are immediately below the Finn's Point ranges, and was proceeding upon a course which would have carried her safely to the eastward of the Newcastle and of the pier, a tug with a large schooner in tow came down the river, and signals of passing to port were exchanged between the tug and the Falloden Hall. At the time these signals were exchanged, in addition to the tow that was approaching between the Newcastle and the dredges at anchor, another small craft—a launch 50 or 60 feet long—was also between the Newcastle and the dredges, and was moving slowly up stream, showing a light upon each end. West of the Newcastle a river steamboat was coming down in the shallower water between the pier and Reedy Island. With the lights of all these vessels in sight, the pilot of the Falloden Hall was compelled to go to the westward, for there was not sufficient distance between the tow and the Newcastle, or between the tow and the dredges, to justify him in attempting to pass at night between either two of these three visible obstacles—to say nothing of the launch; and, even if he could have safely crossed the bows of the moving tug, and have reached the channel east of the dredges, he would have found his ship in dangerously shallow water. After the exchange of passing signals with the tug, the course of the Falloden Hall was changed sufficiently to enable her to pass the tow, and also to pass the Newcastle, which was still further to the westward. After she had passed the Newcastle, the pier was observed for the first time by the Falloden Hall, and appeared to be a dark, indistinguishable object, the exact character of which could not be immediately ascertained. It was discovered by those on the deck of the steamship as early as was possible in the exercise of proper care and diligence. The night was very dark, and the only light that was displayed on the pier could not

be seen from the position to which the vessel had been forced. The pier was probably not more than 200 or 300 yards away when its outlines were seen, and the situation evidently presented nothing but a choice of two evils. To the westward was room enough on the surface of the stream, but the depth was not enough for vessels drawing as much water as the Falloden Hall. Deep-draught steamships never used that part of the channel, and it was certain that, if the helm were put to starboard, the vessel would run aground, and must risk the injury of stranding, and of contact with unknown obstructions. To the eastward there was depth enough, but the tide was approaching the flood, the ship was heavily loaded, and the distance was so short that the pier could scarcely be escaped if the vessel continued to move. Under such circumstances it seems to me that the prompt decision of the pilot was correct—indeed, that nothing else could have been prudently done. He ordered the helm hard aport, the engines full speed astern, and the anchor dropped, in the hope of stopping the ship's way, and at the same time of keeping her in water of sufficient depth. The order was obeyed at once, but the effort was in vain, and the collision took place. The cost of repairing the damage was $8,022.98, which was paid about January 1, 1901.

Upon these facts, which I find to be established by the testimony, part of which comes from the mouth of disinterested witnesses, I am unable to find affirmatively that the pilot was negligent. On the contrary, I think that the government has not only failed to sustain the burden of proof in this respect, but that the evidence as a whole justifies the pilot in the course that he pursued. The shoal at the foot of the Finn's Point range warranted him in following the practice of other vessels that drew as much water as the Falloden Hall, and in keeping to the west side of the channel. As he approached the pier, darkness having fully set in, he found the breadth of the accessible channel nearly occupied by vessels. Almost upon the ranges, perhaps a little to the east of them, were the dredges at anchor. West of these was a tug with a tow, and somewhere in that neighborhood the lights of the launch, which the captain (as his deposition seems to indicate) apparently supposed to be a barge. The pilot received a signal to pass the tow to port, and, even if he had refused to acquiesce in this maneuver, he could not have passed to starboard without encountering the serious risk of collision with the tow or with one of the dredges. The space between the Newcastle and the tow was too narrow to afford a safe passage in the dark, and he was, therefore, driven to the west of the Newcastle, where he knew the water would soon become too shallow for the steamship. Forced into this critical position, the insufficiently lighted pier was suddenly discovered, and he was obliged to act upon the instant. It must be presumed that, as a licensed branch pilot, he knew that he was in the neighborhood of the quarantine station, and that the pier was an obstacle that must be avoided. But I do not think he was bound at his peril to know in the dark within a few yards, precisely where a relatively small, invisible, and unlighted object was to be found. If he had had the aid that is now afforded by the light on the southern end of the pier, and had thus been warned a little sooner,

so that precautions might have been taken—even five or ten minutes earlier—I have little doubt that the collision would have been avoided. As it was, he found himself in a position of peril without fault of his own, and was forced to choose one of two dangers. If he made an error of judgment under such circumstances, I do not think it should be reckoned as actionable negligence.

Judgment may be entered in favor of the defendant.